UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STEPHANIE WARREN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:14-CV-3993-B |
| | § | |
| FEDERAL NATIONAL MORTGAGE | § | |
| ASSOCIATION a/k/a FANNIE MAE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Federal National Mortgage Association a/k/a Fannie Mae's (Fannie Mae) Motion for Summary Judgment. Doc. 53. For the following reasons, the Court **GRANTS** Fannie Mae's Motion.

## I.

## BACKGROUND[1]

This is an employment discrimination case. Plaintiff Stephanie Warren (Warren) contends that Fannie Mae terminated her from her position as a sales representative with the company based on her race. *See, e.g.*, Doc. 28, Pl.'s Second Am. Compl. ¶¶ 4.02, 4.07, 4.12 [hereinafter Pl.'s SAC]. Fannie Mae fired Warren in February 2013. *Id.* ¶ 4.07. The reason for Warren's termination lies at the heart of this suit. Warren maintains that she was fired because of her race. *Id.* ¶ 6.03. Fannie Mae counters that it was because she violated company policy by engaging in an improper relationship

---

[1] The Court takes its factual account from the uncontested facts contained in the summary judgment record. Any contested fact is identified as the allegation of a particular party.

with an outside real estate broker. *See, e.g.*, Doc. 54, Def.'s Br. Supp. Mot. Summ. J. 1, 6 [hereinafter Def.'s Br.].

Fannie Mae is a publicly traded company created by congressional charter to support the national housing market by investing in mortgage loans. 12 U.S.C. § 1723a; Doc. 28, Pl.'s SAC ¶ 4.01. Due to its mortgage investments, Fannie Mae owns real estate throughout the United States. Doc. 54, Def.'s Br. 3. More specifically, when a property secured by one of Fannie Mae's mortgage interests is foreclosed upon, Fannie Mae takes ownership of the property—a "real estate owned" (REO) property—to manage and eventually sell it. *Id.*

To facilitate the sale of REO properties, Fannie Mae employs sales representatives who work to sell the properties through licensed outside brokers in an assigned territory. *Id.* (citing Doc. 55, Def.'s App. Supp. Mot. Summ. J. 77:10–78:13 [hereinafter Def.'s App.], Ex. 5, Warren Depo.). Fannie Mae then contracts with outside brokers (REO Brokers) after a rigorous screening process to work with Fannie Mae's sales reps to assist with the maintenance and disposition of REO properties. *Id.* at 4; Doc. 28, Pl.'s SAC ¶¶ 4.02–04. As part of that screening and contracting process, sales reps can recommend to Fannie Mae's management team that particular real estate agents be selected as REO Brokers. Doc. 54, Def.'s Br. 4 (citing Doc. 55, Def.'s App. 78:8–79:25, Ex. 5, Warren Depo.). If selected as brokers, then those agents receive unique passwords to access Fannie Mae's proprietary Asset-Management Network (AMN). *Id.* at 4–5.

Warren started working for Fannie Mae in July 1996. Doc. 28, Pl.'s SAC ¶ 4.02; Doc. 54, Def.'s Br. 9. And at all times relevant to this case, Warren worked for Fannie Mae as a sales rep. Doc. 54, Def.'s Br. 9 (citing Doc. 55, Def.'s App. 76–77, Ex. 5, Warren Depo.); *see also* Doc. 66, Pl.'s App. Supp. Pl.'s Resp. 1 [hereinafter Pl.'s App.], Ex. 1, Warren Decl. ¶ 3 [hereinafter Warren Decl.]. In

2010, Warren was assigned to Fannie Mae's Virginia territory. Doc. 54, Def.'s Br. 9 (citing Doc. 55, Def.'s App. 81, Ex. 5, Warren Depo.). While there, she met Rhyan Finch, a Virginia real estate agent who later became an approved REO Broker for Fannie Mae's Virginia properties. *See* Doc. 66, Pl.'s App. 2, Warren Decl. ¶¶ 8–10.

Warren moved from Fannie Mae's Virginia territory to its Pennsylvania territory in 2011. *Id.* ¶ 6. To carry out her duties there, Warren needed the help of real estate agents in Pennsylvania. Doc. 28, Pl.'s SAC ¶ 4.03. With that in mind, Warren requested and Fannie Mae provided a list of agents available in the area. *Id.* ¶ 4.09; Doc. 54, Def.'s Br. 11. The list included just one potential agent: Emma Djiya. Doc. 28, Pl.'s SAC ¶¶ 4.06, 4.09; Doc. 54, Def.'s Br. 11.

Finch was not listed as an option. *See* Doc. 28, Pl.'s SAC ¶¶ 4.06, 4.09; Doc. 54, Def.'s Br. 11. Nevertheless, Warren spoke with Finch before proposing to Fannie Mae any names as potential REO Brokers. Doc. 54, Def.'s Br. 11 (citing Doc. 55, Def.'s App. 86–87, Ex. 5, Warren Depo.); Doc. 66, Pl.'s App. 2, Warren Decl. ¶ 12. Finch independently recommended Djiya and said that he would assist with bringing her up to speed to handle and market properties. Doc. 54, Def.'s Br. 11 (citing Doc. 55, Def.'s App. 86–91, Ex. 5, Warren Depo.); Doc. 66, Pl.'s App. 2, Warren Decl. ¶ 12. After a brief conversation with Djiya in which she confirmed that Djiya would receive assistance from Finch, Warren recommended to Fannie Mae that Djiya be on-boarded as a REO Broker. Doc. 54, Def.'s Br. 11 (citing Doc. 55, Def.'s App. 90, Ex. 5, Warren Depo.).

Fannie Mae asserts and its summary judgment evidence indicates that in March 2012, Finch emailed Warren to say that Djiya's application to Fannie Mae had been submitted, and attached to the email copies of documents that Warren was supposed to submit to Fannie Mae about Djiya's application. *Id.* at 12 (citing Doc. 55, Def.'s App. 92–93, Ex. 5, Warren Depo.). Finch, Fannie Mae

says, had filled in the documents to look as though Warren had completed them when in fact he had. *Id.* The documents included an email address and phone number for Djiya that were different from her usual email and phone number. *Id.* (citing Doc. 55, Def.'s App. 119, Ex. 5, Warren Depo.). Finch could access the new email address and potentially the phone line, too. Doc. 54, Def.'s Br. 12 (citing Doc. 55, Def.'s App. 131–33, Ex. 5, Warren Depo.). Warren knew that communications intended for Djiya also went to Finch. *Id.* Fannie Mae maintains that none of its other employees did. *Id.* Finch closed his email to Warren by saying: "Can you delete my name from the email forwarding it on and they can use the email in the form as it goes to me as well as the phone call." *Id.* (quoting Doc. 55, Def.'s App. 186, Ex. 6, Warren Depo. Ex. 1.).

Fannie Mae's summary judgment indicates—and Warren does not appear to contest—that Warren and Finch exchanged a few more emails about Djiya's application as it wound through Fannie Mae's screening process. *See id.* at 12–13 (citing Doc. 55, Def.'s App. 94, 97–98, 189, 191–92). Warren's deposition testimony further indicates that while she did not forward the documents pre-filled by Finch, neither did she inform her manager at that time about Finch's involvement with Djiya's application. *Id.* at 13 (citing Doc. 155, Def.'s App. 99, Ex. 5, Warren Depo.). Fannie Mae eventually completed its screening process and on-boarded Djiya as a REO Broker, at which point she started working with Warren on the sale and disposition of REO properties. *See id.*; Doc. 28, Pl.'s SAC ¶ 4.06. This case turns on the working relationship between Warren, Djiya, and Finch—and more specifically, Fannie Mae's investigation into whether that relationship violated its internal personnel policies.

Fannie Mae maintains that it employs both practical and formal safeguards to avoid potential conflicts of interest between sales reps and REO Brokers. Doc. 54, Def.'s Br. 3–4. In that regard,

Fannie Mae often reassigns its territories among sales reps and uses multiple REO Brokers within a given sales rep's territory. *Id.* But as a more formal measure, Fannie Mae has a Code of Conduct and personnel policy that govern, among other things, sales reps' relationships and interactions with REO Brokers. *Id.*[2]

Fannie Mae states that its Code of Conduct and personnel policy aim to prevent the existence or appearance of impropriety or conflict between Fannie Mae and its REO Brokers. Doc. 54, Def.'s Br. 4; *see also* Doc. 55, Def.'s App. 278, Ex. 21, Conflict of Interest Policy. Along those lines, Fannie Mae's Code of Conduct articulates a non-exhaustive list of "Code Breakers," that is, examples of conduct that would violate the code. Doc. 54, Def.'s Br. 4 (citing Doc. 55, Def.'s App. 256, Ex. 19, Arrington Decl.). Listed among those exemplary Code Breakers is: "Giving one Fannie Mae vendor an inappropriate advantage over other vendors." *Id.* Read in context, Fannie Mae says, that means that its employees may not engage in conduct that either: (1) gives a vendor an inappropriate advantage; or (2) appears to give a vendor an inappropriate advantage. *See id.*; *see also* Doc. 65, Pl.'s Resp. 10–11, 22, 25. Fannie Mae claims that it requires that all of its employees, including Warren when she worked there, review the Code of Conduct annually. Doc. 54, Def.'s Br. 4 (citing Doc. 55, Def.'s App. 162:4–13, Ex. 5, Warren Depo.).

Fannie Mae asserts that its dedicated investigations unit examines alleged violations of its Code of Conduct and personnel policies. *Id.* at 5; *see also* Doc. 65, Pl.'s Resp. 12, 27. The

---

[2]Warren does not specifically challenge the contents of Fannie Mae's Code of Conduct or personnel policy but continually references Fannie Mae's "internal policy" or "alleged policy" throughout her briefing. *See* Doc. 65, Pl.'s Resp. to Def.'s Mot. Summ. J. 4, 7, 15, 18–20, 22–23 [hereinafter Pl.'s Resp.]. The Court therefore concludes that Warren does not contest the existence and contents of the policies and procedures proffered by Fannie Mae in its summary judgment evidence. Rather, she disputes whether these policies and procedures were properly applied in this case.

investigations unit's practices are governed by Fannie Mae's Investigations Policy, which, at least on paper, strives to ensure that investigations are fair, impartial, and insulated from influence by Fannie Mae's management team. Doc. 54, Def.'s Br. 5 (citing Doc. 55, Def.'s App. 264, Ex. 20, Investigations Policy). Warren, as will soon become apparent, disputes that the investigation of her conduct was impartial. *See, e.g.*, Doc. 65, Pl.'s Resp. 12 (arguing that Fannie Mae engaged in a sham investigation).

In any event, Fannie Mae says that once an investigation is complete, the lead investigator identifies "directed action" to be taken as a result of the investigation's findings. Doc. 54, Def.'s Br. 5. Fannie Mae's Chief Compliance Officer then purportedly reviews the proposed directed action before it is implemented. *Id.* at 5–6. During that process, the proposed directed actions are often discussed with Fannie Mae's management team. *See id.* Fannie Mae maintains—but Warren disagrees—that those discussions are just to ensure that all pertinent information is on the table; management supposedly has no input into the selection or enactment of directed actions. *Id.*; *see also* Doc. 65, Pl.'s Resp. 7, 12, 23.

The allegations at issue here involve former REO Brokers Finch and Jonathan Spinetto. Doc. 28, Pl.'s SAC ¶ 4.05; Doc. 54, Def.'s Br. 6. Fannie Mae alleges that in 2012, it received an anonymous tip that one of its sales reps, Stephanie Neugent, had helped Finch to establish a referral network through which he received fees for referring REO properties to other agents. Doc. 54, Def.'s Br. 6. Fannie Mae says that its investigations unit looked into the complaint, determined that Neugent's conduct violated the Code of Conduct and Conflict of Interest Policy, and proposed as directed action that she be fired as a result. *Id.* (citing Doc. 56, Def.'s Sealed App. Supp. Mot. Summ. J. 563–75, Ex. 52, Neugent Inv. Decision [hereinafter Def.'s Sealed App.]). Management agreed and

fired Neugent. *See id.*; *see also* Doc. 56, Def.'s Sealed App. 578, Ex. 53, Approval Memo re: Stephanie Neugent.

Fannie Mae claims that its mortgage fraud group later expanded the investigation into Finch's conduct, as well as that of another unrelated broker named Jonathan Spinetto. Doc. 54, Def.'s Br. 7. Fannie Mae maintains that it concluded through the investigation that Finch and Spinetto improperly: (1) accessed the AMN without Fannie Mae's authorization or approval using other brokers' login credentials and passwords; (2) required the brokers that they worked with to split commissions as payment; and (3) masked their participation by creating false emails and phone numbers to lead Fannie Mae to believe that it was contacting other brokers when it was in fact corresponding with Finch and Spinetto. *Id.* Fannie Mae also became concerned that sales reps other than Neugent were implicated by Finch and Spinetto's behavior. *Id.* at 8.

For that reason, Fannie Mae states, its investigations unit looked into which sales reps had worked with either Finch or Spinetto. *Id.* That inquiry initially identified 12 employees but two more names later came to light through ensuing investigations. *Id.*; Doc. 65, Pl.'s Resp. 22–24. Warren was among the first 12—Finch, cooperating with Fannie Mae's request, specifically named Warren as a sales rep who he had worked with in a list forwarded to the investigations unit. Doc. 54, Def.'s Br. 8 (citing Doc. 55, Def.'s App. 303–05, Ex. 23, Finch Depo.). Fannie Mae asserts that an investigation into Warren's behavior then began as a result of Finch's report. *Id.* at 9.

Fannie Mae claims that its investigation uncovered a number of questionable or improper activities by Warren, including: (1) acquiescing to Finch's unauthorized access of Fannie Mae's AMN using Djiya's login credentials; (2) letting Finch conduct training for Djiya that Warren should have conducted herself; (3) permitting Finch to manage or at least be involved in managing REO

properties assigned to Djiya; and, most importantly, (4) not telling anyone about it. Doc. 54, Def.'s Br. 13–15. In essence, Fannie Mae says, when Warren worked with Djiya, she was actually working with Finch. *Id.* And despite, Fannie Mae maintains, signs that interplay might be improper—for instance, Warren's annual review of Fannie Mae's Code of Conduct or requests that names be redacted from emails—Warren never reported it to her supervisor or other superior.[3] *Id.*

Warren casts these facts in a different light. Djiya was the only REO Broker available in the area, so she worked with her. Doc. 28, Pl.'s SAC ¶ 4.09. What's more, her understanding of Fannie Mae's rules and practices allowed for relationships like that between Finch and Djiya. *Id.* ¶ 4.10. And Warren never received payments, kickbacks, or any other benefits from Finch or Djiya. *Id.* ¶ 4.11. Therefore, Warren says, nothing was amiss and there was no conflict of interest. *Id.*

Nevertheless, Fannie Mae says that its investigations unit concluded that Warren's actions created an appearance of impropriety. Doc. 54, Def.'s Br. 15. Warren's deposition testimony, proffered by Fannie Mae, indicates that in August 2012 another REO Broker in Pennsylvania contacted Warren and asked whether Djiya was working with someone in Virginia. *Id.* (citing Doc. 55, Def.'s App. 122–23, Ex. 5, Warren Depo.). Fannie Mae says that Warren reported that call to Djiya and Finch, but not to her supervisor or any other superior. *Id.* (citing Doc. 55, Def.'s App. 125–26, Ex. 5, Warren Depo.). Fannie Mae claims that based on all of those occurrences and Warren's failure to report them to management, the lead investigator on Warren's case, Leslie Arrington, determined that termination was the appropriate direct action to take. *Id.* at 15–18.

---

[3]Warren says that she might have told her supervisor about something to do with Finch. *See* Doc. 65, Pl.'s Resp. 18. But as addressed below, the Court disagrees and finds Warren's argument and treatment of evidence offered in support of it somewhat misleading.

Fannie Mae says that its Chief Compliance Officer Nancy Jardini then reviewed and approved the proposed directed action. *Id.* at 18.

In February 2013, Fannie Mae's Director of Sales informed Warren that she was being terminated for allegedly violating Fannie Mae's Code of Conduct in connection with her work on REO properties in Pennsylvania. Doc. 28, Pl.'s SAC ¶ 4.07. A few days later, Warren received a letter from Meghan Chadsey, an internal investigator, informing her that she was fired for failing to maintain an arm's length relationship with Finch. *Id.* ¶ 4.08. Warren asserts that Fannie Mae's reasons for firing her are false and pretext for illegal discrimination. *Id.* ¶ 4.09.

On that basis, Warren filed suit in state court against Fannie Mae and Jerome Devadoss, Fannie Mae's Director of Real Estate Asset Management**.** *See* Doc. 1, Notice of Removal, Ex. A-2, Pl.'s Orig. Pet. Warren amended her state suit, dropping Devadoss and adding Ray Donovan, an employee in Fannie Mae's auction sales department. *Id.*, Ex. 6 Pl.'s Am. Pet. Fannie Mae, in turn, removed the case to this Court. *See id.* Warren moved to remand the case to state court, but the Court denied her motion and dismissed Warren's claims against Donovan after finding that he had been improperly joined. *See* Doc. 23, Order.

Warren then filed her Second Amended Complaint against Fannie Mae and Arrington, the lead investigator on Warren's case. *See* Doc. 28, Pl.'s SAC. In it, Warren asserts the following claims: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e, and the Texas Commission on Human Rights Act (TCHRA), Tex. Labor Code §§ 21.001 *et seq.*, against Fannie Mae; (2) race discrimination in violation of 42 U.S.C. § 1981 (Section 1981) against Fannie Mae and Arrington; and (3) defamation against Fannie Mae. *Id.* ¶¶ 5.01–7.07.

The Court has already dismissed Warren's defamation claim. *See* Doc. 36, Elec. Order. The

Court has also dismissed Warren's claims against Arrington under Federal Rule of Civil Procedure 4(m) for failure to timely serve Arrington with process. *See* Doc. 51, Order. So the only claims remaining are those against Fannie Mae for race discrimination under Title VII, Section 1981, and the TCHRA. Fannie Mae's Motion for Summary Judgment (Doc. 53) seeks to dismiss all three. Warren has responded to Fannie Mae's Motion, and Fannie Mae has replied. *See* Doc. 65, Pl.'s Resp.; Doc. 69, Def.'s Reply to Pl.'s Resp. [hereinafter Def.'s Reply]. Thus, Fannie Mae's Motion is ripe for the Court's review.

## II.

## LEGAL STANDARDS

A. *Summary Judgment*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.*, 919 F.2d 301, 303 (5th Cir. 1990). Usually, this requires the movant to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). But if the non-movant ultimately bears the burden of proof at trial, the movant may satisfy its burden just by pointing to the absence of evidence supporting the

non-movant's case. *Id.* at 322–23.

If the movant meets that burden, then it falls to the non-movant to "show with significant probative evidence that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (internal quotation marks omitted) (citing *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)). And significant probative evidence is just that: significant. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam). "[M]etaphysical doubt as to material facts," "conclusory allegations," "unsubstantiated assertions," or a mere "scintilla of evidence" will not do. *Id.* (internal citations and quotation marks omitted). Rather, "the non-movant must go beyond the pleadings and present specific facts indicating a genuine issue for trial." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (citing *Celotex*, 477 U.S. at 324).

To be sure, the court views evidence in the light most favorable to the non-movant when determining whether a genuine issue exists. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). Yet it need not "sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). Simply put, the non-movant must "identify specific evidence in the record" and "articulate the precise manner in which that evidence supports [its] claim." *Id.* If it cannot, then the court must grant summary judgment. *Little*, 37 F.3d at 1076.

B.    *The McDonnell Douglas Burden Shifting Framework*

As referenced, Warren has asserted race discrimination claims under Title VII, Section 1981, and the TCHRA. The Court employs the *McDonnell Douglas* burden shifting framework to analyze

all of those claims.

Claims brought under Title VII and Section 1981 "are 'governed by the same evidentiary framework,' such that the analyses under both statutes are substantively the same." *Jackson v. Watkins*, 619 F.3d 463, 466 (5th Cir. 2010) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 n.7 (5th Cir. 2004)). The same goes for "[c]laims of race discrimination brought under Title VII and the TCHRA." *Bender v. Shulkin*, No. 3:14-cv-2595-L, 2017 WL 1156327, at *6 (N.D. Tex. Mar. 22, 2017) (quoting *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999); *see also Reed v. Neopost USA, Inc.*, 701 F.3d 434, 439 (5th Cir. 2012) (noting parallelism between Title VII and the TCHRA). On that basis, the Court may address all three of Warren's claims together using the Title VII evidentiary framework. *See Bender*, 2017 WL 1078509, at *6; *Jackson*, 619 F.3d at 466.

Title VII prohibits employers from discharging or otherwise discriminating against employees because of race. *See* 42 U.S.C. § 2000e-2(a). Should discrimination occur, "Title VII affords employees the option of proving a violation through either direct or circumstantial evidence." *Jackson*, 619 F.3d at 466. Warren relies on circumstantial evidence.[4] For that reason, the Court analyzes her claims "under the three-step, burden-shifting analysis embodied in the 'modified *McDonnell Douglas* approach.'" *Jackson*, 619 F.3d at 466 (quoting *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)).

First, the plaintiff must "establish a prima facie case of discrimination." *Id.* "'Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at

---

[4]Warren makes no indication that she bases her claims on direct evidence of race discrimination, nor can the Court locate any such evidence relied upon in the record. Indeed, Warren's argument in response to Fannie Mae's Motion for Summary Judgment classifies this case as one "without direct evidence," and skips right to the *McDonnell Douglas* burden shifting framework. Doc. 65, Pl.'s Resp. 13. The Court sees no reason to disagree.

this stage of the case is not onerous.'" *Reed*, 701 F.3d at 439 (quoting *Mission Consol. Ind. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 633 (Tex. 2012)). Second, if the plaintiff shows a prima facie case, then "the 'burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action.'" *Id.* (quoting *Black v. Pan Am. Labs., L.L.C.*, 646 F.3d 254, 259 (5th Cir. 2011)). "This is a burden of production, not persuasion, on the employer's part, and it 'can involve no credibility assessment.'" *Bender*, 2017 WL 1078509, at *6 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Third, "[i]f the employer meets its burden, then the burden shifts back to the plaintiff to make an ultimate showing of intentional discrimination." *Reed*, 701 F.3d at 339.

To do so, the plaintiff "may proceed under one of two alternatives: the pretext alternative or the mixed-motives alternative." *Jackson v. Watkins*, No. 3:07-cv-1837-D, 2009 WL 1437824, at *3 (N.D. Tex. May 21, 2009), *aff'd*, 619 F.3d 463 (5th Cir. 2010). For pretext, the plaintiff "must 'offer sufficient evidence to create a genuine issue of material fact that [the employer's] reason is not true, but is instead a pretext for discrimination.'" *Id.* (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)) (internal alterations omitted).

To prevail under the mixed-motives alternative, by contrast, the plaintiff "must offer sufficient evidence to create a genuine issue of material fact 'that [the employer's] reason, while true, is only one of the reasons for [its] conduct, and another motivating factor is [the plaintiff's] protected characteristic.'" *Id.* Simply put, under the mixed motives theory "the plaintiff can survive summary judgment by producing evidence that creates a jury issue as to the employer's discriminatory animus or the falsity of the employer's nondiscriminatory explanation." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002).

## III.

## ANALYSIS

A.   *Objections to Evidence*

Before analyzing Warren's race discrimination claims, the Court must first address Fannie Mae's objections to Warren's summary judgment evidence. Fannie Mae objects to Warren's submission of: (1) Keitha Jefferson's Declaration; and (2) Warren's own Declaration[5] to the extent that it contradicts with her prior deposition testimony. Doc. 67, Def.'s Obj. 1–5. The Court addresses each objection in turn.

### 1.   Keitha Jefferson Declaration

Keitha Jefferson was formerly employed by Fannie Mae as a real estate asset analyst and foreclosure specialist. *See* Doc. 66, Pl.'s App. 527, Ex. 10, Jefferson Decl. Jefferson claims that Fannie Mae improperly terminated her after a biased investigation by Chadsey and Arrington in retaliation for her reporting unpaid overtime hours and requesting disability accommodation. *Id.* at 528–31. Warren offers her declaration to challenge the trustworthiness and character of Fannie Mae's investigators, Chadsey and Arrington. *See* Doc. 72, Pl.'s Resp. to Def.'s Obj. 2 [hereinafter Pl.'s Obj. Resp.]

Fannie Mae argues that Jefferson's Declaration should be excluded because it is irrelevant, prejudicial, hearsay, not based on personal knowledge, and improper opinion testimony. *Id.* at 1–3. Warren, by contrast, argues that Jefferson's testimony is intimately relevant in that it speaks to

---

[5]Fannie Mae initially objected to Warren's entire declaration because it was undated. *See* Doc. 67, Def.'s Obj. to Pl.'s Resp. 4 [hereinafter Def.'s Obj.]. Yet Warren appears to have remedied that issue. *See* Doc. 73, Def.'s Reply to. Pl.'s Resp. to Def.'s Obj. ¶ 14 [hereinafter Def.'s Obj. Reply]. In light of Warren's correction, Fannie Mae now appears to object only to that portion of the declaration mentioned above. *See id.*

Fannie Mae's investigator's bad faith. Doc. 72, Pl.'s Obj. Resp. 2. Further, Warren continues, Jefferson's Declaration is not hearsay because it is based on party admissions by Fannie Mae's employees, and is not improper opinion evidence because it is based on her own experience. *See id.* at 3–4.

The Court agrees with Fannie Mae. As an initial matter, Warren purportedly offers Jefferson's declaration to attack Chadsey and Arrington's credibility. It has no other evidentiary value. Yet credibility determinations are not allowed at the summary judgment stage. *See Baylor Cty. Hos. Dist. v. Burwell*, 163 F. Supp. 3d 372, 377 (N.D. Tex. 2016) ("The Court cannot make a credibility determination in light of conflicting evidence or competing inferences."). Even if the Court were to overlook that shortcoming, Jefferson's Declaration is wholly unrelated to facts at hand. She was employed by Fannie Mae at the same time as Warren but the similarities end there—the two held different jobs, were fired for purportedly different reasons, and asserted different claims. *See* Doc. 66, Pl.'s App. 528–29, Ex. 10, Jefferson Decl. So her testimony, in addition to being replete with conclusory allegations, is irrelevant. Nothing in Jefferson's Declaration is probative of whether Fannie Mae discriminated against Warren because of her race. *See* Fed. R. Evid. 401.

Fannie Mae offers a number of other persuasive reasons for why Jefferson's declaration should be excluded. *See* Doc. 73, Def.'s Reply Obj. 2–6. Yet the Court need not address them here. Jefferson's Declaration is, at bottom, irrelevant. For that reason, the Court **SUSTAINS** Fannie Mae's objection on this point.

2. <u>Warren's Declaration</u>

Warren offers her own sworn declaration to set out her version of the facts pertinent to this case as of the date of her Response to Fannie Mae's Motion for Summary Judgment. Docs. 66, Pl.'s

App. 1-11, Warren Decl.; 72, Pl.'s Obj. Resp. 4–6. Fannie Mae objects to Warren's Declaration to the extent that it contradicts her prior testimony, and argues that Warren's contradictory declarations are a "sham" to skirt summary judgment. Docs. 67, Def.'s Obj. 4; 73, Def.'s Obj. Reply ¶ 23. Fannie Mae asserts that Warren's Declaration contradicts her earlier testimony in two places in particular: Paragraphs 20 and 22. *Id.* Warren, by contrast, contends that her Declaration is not a "sham" because it includes proper testimony about her intent and does not contradict her prior deposition testimony. Doc. 72, Pl.'s Obj. Resp. 4–7.

It is well-settled that the Fifth Circuit "'does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.'" *Hudson v. Cleco Corp.*, 539 F. App'x 615, 620 (5th Cir. 2013) (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)); *see also Albertson v. T.J. Stevenson & Co.*, 749 F.2d 223, 233 n.9 (5th Cir. 1984) ("The nonmoving party cannot defeat a motion for summary judgment by attempting to create a disputed material fact through the introduction of an affidavit that directly conflicts with his prior deposition testimony.").

Fannie Mae says that Paragraph 20 is contradictory because it claims that Djiya performed the "Broker Price Opinions on the properties" and supervised "the arrangement for utilities and repair estimates," whereas her earlier declaration stated that Djiya was "doing the day-to-day" operation of the business. Doc. 67, Def.'s Obj. 4 (citing Doc. 55, Def.'s App. 125, 129, Ex. 5, Warren Depo.; Doc. 66, Pl.'s App. 1-11, Warren Decl.). The particular transcript excerpts at issue from Warren's deposition state:

> Q.    Do you know if the utilities were in the name of Ms. Djiya?
> A.    I do not.
> . . .

> Q. And we've talked a lot about these, but let me just ask you—ask specifically with regard to this email. With respect to Ms. Djiya, what was your understanding about whose name the utilities were in Pennsylvania on the properties—the Fannie Mae properties?
>
> A. My understanding is it was under her name.

Doc. 55, Def.'s App. 128:11–12; Doc. 72-1, Pl.'s App. Supp. Pl.'s Obj. Resp. 1:17–23. As Warren points out, those answers read in context allow for the possibility that Warren might have assumed the utilities were listed under Djiya's name. *See* Doc. 72, Pl.'s Obj. Resp. 5–6. But Warren's Declaration transforms that possibility into a certainty:

> However, I investigated and received confirmation that Djiya or agents working in her officer [sic] were performing the Broker Price Opinions on the properties, and were supervising the arrangements for utilities and repair estimates.

Doc. 66, Pl.'s App. 6, Warren Decl. ¶ 20. Warren fails to adequately explain that discrepancy, and instead argues that both sets of statements are consistent. Doc. 72, Pl.'s Obj. Resp. 5–6. The Court disagrees and concludes that Paragraph 20 of Warren's declaration contradicts her prior deposition testimony. Fannie Mae's objection on that point is therefore **SUSTAINED**. " *See Hudson*, 539 F. App'x at 620.

As to Paragraph 22, Fannie Mae contends that it is contradictory because in it Warren claims to have told her supervisor about Finch and Djiya, whereas her prior deposition testimony and earlier declaration affirmatively stated that she did not. Doc. 67, Def.'s Obj. 4 (citing Doc. 55, Def.'s App. 99:2–10, 101:11–14, 112:18–113:4, 141:13–142:2, Ex. 5, Warren Depo.; Doc. 66, Pl.'s App. 7, Warren Decl. ¶ 22; Doc. 68, Def.'s App. Supp. Def.'s Obj.). The pertinent excerpts at issue from Warren's deposition state as follows:

> Q. And did you tell Marsha Peters about Rhyan Finch's involvement with Emma Djiya?
>
> A. No, I did not, not on March 21st.

Q. Did you later?

A. I do know that I had every intention of letting Marsha know that Emma was going to be working with Mr. Finch.

Q. Do you know for certain one way or another whether you told Ms. Peters about Mr. Finch's involvement with Ms. Djiya?

A. On March 21st I had not let her know about this information.

. . .

Q. And do you recall when you sent that email, did you tell Ms. Peters that Mr. Finch would be providing services to Ms. Djiya?

A. No, I do not recall telling her that.

. . .

Q. But my question is, no one—to your knowledge, no one except you at Fannie Mae knew that Mr. Finch was providing services to Emma Djiya, correct?

A. As far as I know, I don't know who all Rhyan had spoken to regarding his relationship with Emma.

Doc. 55, Def.'s App. 99:8–19, 101:11–14, 141:13–142:2. Paragraph 22 of an earlier declaration prepared by Warren reiterates that position:

> 22. I never agreed to conceal Finch's involvement from Marsha Peters. Because of my extensive experience, I had very little oversight in the management of my properties. I intended to mention Finch's involvement to Peters when I next met with her, but I was transferred to another territory before that happened.

Doc. 68, Def.'s App. Supp. Def.'s Obj. ¶ 22. But Paragraph 22 of Warren's current Declaration that Fannie Mae objects to flips the script, stating:

> 22. I never agreed to conceal Finch's involvement from Marsha Peters. Because of my extensive experience, I had very little oversight in the management of my properties. I intended to mention Finch's involvement, *and may have actually done so, although I cannot remember with certainty. I believe that this happened because the investigator's notes reveal that someone told Peters that Finch was wanting to go "under the radar," which is terminology he used in an email with me.*

Doc. 66, Pl.'s App. 6, Warren Decl. ¶ 22 (emphasis added).

In sum, Warren's prior deposition testimony and declaration made plain that Warren did not report Finch and Djiya's activity to her supervisor, but the Declaration that she submitted with her

summary judgment evidence says that, on second thought, she might have. Warren tries to explain this switch by pointing to an investigator's report noting that *someone* might have told the investigator that Finch wanted to fly under the radar.

The Court finds Warren's position unpersuasive, especially when considered in context with Warren's arguably misleading representation of the evidence in her summary judgment briefing. The investigator's note about Warren's supervisor that Warren relies on states: "She feels like RF 'trying to fly under radar'—maybe someone told her RF said that." Doc. 66, Pl.'s Br. 82, Peters Depo. Ex. 1. Warren's brief takes license with that note to make it more friendly to her case:

> The investigator's notes reflect a notation that Peters mentioned Finch was "trying to fly under the radar," and that "maybe she [presumably Warren] once told her RF [Rhyan Finch] said that."

Doc. 65, Pl.'s Resp. 17 (quoting *id.*). Warren's drafting turned "someone" to "she" and "she" to "Warren." But even overlooking what the Court will chalk up to difficulty reading the investigator's handwritten notes, Warren has not sufficiently explained her contradictory testimony.

Whether Warren reported Finch and Djiya's activity to her supervisor is a key fact in this case. Thus, it appears that Warren is just "attempting to create a disputed material fact through the introduction of an affidavit that directly conflicts with [her] prior deposition testimony," as well as her earlier declaration. *Albertson*, 749 F.2d at 233 n.9. For that reason, the Court **SUSTAINS** Fannie Mae's objection to Paragraph 22 of Warren's Declaration. " *See Hudson*, 539 F. App'x at 620.

B.      *Race Discrimination Claims*

As referenced, the Court addresses all three of Warren's race discrimination claims together

using the Title VII evidentiary framework.[6] *See Bender*, 2017 WL 1078509, at *6; *Jackson*, 619 F.3d at 466. Warren's claims rest on circumstantial evidence. *See supra* note 4. Thus, the Court analyzes them "under the three-step, burden-shifting analysis embodied in the 'modified *McDonnell Douglas* approach.'" *Jackson*, 619 F.3d at 466 (quoting *Burrell*, 482 F.3d at 411).

First, Warren must "establish a prima facie case of discrimination." *Id.* Second, if Warren meets her burden, then Fannie Mae "must articulate a legitimate, nondiscriminatory reason for terminating" Warren. *Id.* Third, if Fannie Mae meets its burden, then Warren must demonstrate that Fannie Mae's "legitimate, nondiscriminatory reasons were pretexts for discrimination." *Id.*

Both parties have assumed here that Warren satisfied her initial burden. *See* Doc. 54, Def.'s Br. 20 n.15; Doc. 65, Pl.'s Resp. 14. So the Court also assumes, without deciding, that Warren has established a prima facie case of discrimination. The Court now turns to the second and third steps of the *McDonnell Douglas* test.

1.    Legitimate, Nondiscriminatory Reason

Fannie Mae states that its legitimate, nondiscriminatory reason for firing Warren is that she violated Fannie Mae's Code of Conduct and Conflict of Interest Policy. *See* Doc. 54, Def.'s Resp. 20–21. Fannie Mae submits a litany of summary judgment evidence to support that position, including: (1) Warren's deposition; (2) Finch's deposition; (3) the depositions of Fannie Mae's corporate representatives; and (4) copies of Fannie Mae's Code of Conduct and personnel policies, including its Investigations and Conflict of Interest Policies. *See* Doc. 55, Def.'s App. 1–3, Index.

---

[6]Fannie Mae also asserts a standalone argument against Warren's TCHRA claim for her alleged failure to timely submit the claim to arbitration. *See* Doc. 54, Def.'s Br. 18. Yet the Court need not address that argument because as explained below, Fannie Mae's alternative argument under the *McDonnell Douglas* framework is successful.

Fannie Mae further submitted detailed records of its investigations into employees, including Warren, potentially implicated by reports of Finch and Spinetto's activities. *Id.*

The summary judgment evidence shows, and Warren does not dispute, that Warren worked with Finch, both in Virginia and in Pennsylvania. *See, e.g.*, Doc. 55, Def.'s App. 81:7–83:7, Ex. 5, Warren Depo. It goes on to show that Warren knew that Djiya and Finch worked together in a consulting-type relationship whereby Finch could access communications sent from Fannie Mae or its employees, including Warren, to Djiya, as well as access Fannie Mae's AMN. *See id.* at 106, 131–34. As set forth above, the summary judgment record also demonstrates that Warren did not report those activities or otherwise convey her knowledge of them to a superior. *See supra* p. 15–17; *see also* Doc. 55, Def.'s App. 99:2–10, 101:11–14, 112:18–113:4, 141:13–142:2, Ex. 5, Warren Depo. The record further displays that another REO Broker contacted Warren to inquire about Finch and Djiya's relationship—Warren failed to report that inquiry to her supervisor or Fannie Mae's management team but did discuss it with Finch. Doc. 55, Def.'s App. 122–25, Ex. 5, Warren Depo.

As referenced, Fannie Mae's investigations unit received reports about potential Code of Conduct violations by a number of its employees, including Warren, related to their alleged dealings with Finch and Spinetto. Doc. 54, Def.'s Br. 20. The summary judgment evidence shows that Fannie Mae investigated each of the reported employees. *See* Doc. 56, Def.'s Sealed App. 385–590, Exs. 33–53, Investigation Files & Disciplinary Decisions. While Warren may challenge the validity or efficacy of those investigations, she does not dispute that they took place. *See* Doc. 65, Pl.'s Resp. 14–26.

Fannie Mae's summary judgment evidence also reflects that in conducting those investigations, its investigations unit cast employees into one of three potential categories: (1) where

the employee did not violate the Code of Conduct or personnel policies; (2) where the employee violated the Code of Conduct or personnel policies but where there was no evidence that the employee took affirmative steps to conceal his or her interactions with Finch or Spinetto or Finch or Spinetto's relationship with REO Brokers from management; and (3) where the employee violated the Code of Conduct or personnel policies and there was evidence that the employee took affirmative steps to conceal his or her interactions with Finch or Spinetto or Finch or Spinetto's relationship with REO Brokers from management. Doc. 55, Def.'s App. 224–25, Ex. 19, Arrington Decl. The investigations unit recommended that employees in the first category not be disciplined. *See id.* Employees in the second category were to be disciplined in some form depending on the specific facts but not fired. *Id.* Employees in the third category were to be fired. *Id.*

Through that investigation, Fannie Mae determined that Warren: (1) improperly favored Finch and created the impression among third parties that Fannie Mae condoned Finch's practices; (2) knew that Finch had access to Djiya's AMN and managing properties assigned to Djiya; and (3) took affirmative steps to conceal Finch and Djiya's activities from management. *Id.* at 233–36, Ex. 19, Arrington Decl. Ex. B, Pl.'s Investigations Decision; 237–38, Ex. 19, Arrington Decl. Ex. C, Request for Approval of Pl.'s Investigations Decision. Fannie Mae then fired Warren. *See id.* at 225–26, Ex. 19, Arrington Decl.

The Court concludes that Fannie Mae has satisfied its burden of producing evidence of a legitimate, nondiscriminatory reason for its decision to terminate Warren in that she violated company policy.

2.    Pretext/Mixed Motive

"As [Fannie Mae] has met its burden of production, 'the presumption of discrimination drops

out of the picture, and [Warren] must offer some evidence that the reason proffered was a pretext for discrimination, or that a motivating factor for the employment decision was'" Warren's race. *Bender*, 2017 WL 1156327, at *9 (quoting *Rogers v. Pearland Ind. Sch. Dist.*, 827 F.3d 403, 408 (5th Cir. 2016)). Warren attacks Fannie Mae's rationale alternatively under both theories. Doc. 65, Pl.'s Resp. 14–26; *see also Smith v. Xerox Corp.*, 584 F. Supp. 2d 905, 914 (N.D. Tex. 2008) (explaining that plaintiffs are free to allege in the alternative that their cases involve pretext and mixed motives).

Under the pretext theory, Warren must introduce evidence "'that permits the jury to believe that the [proffered] reason was false and that illegal discrimination was the actual reason.'" *King v. Life School*, No. 3:10-cv-0042-BH, 2011 WL 1562964, at *5 (N.D. Tex. Apr. 26, 2011) (quoting *Nichols v. Lewis Grocer*, 138 F.3d 563, 566 (5th Cir. 1998)). Under the mixed motive theory, Warren "need only present sufficient evidence for a reasonable jury to conclude that race . . . was a motivating factor for the employment practice at issue."[7] *Id.* (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003)). But regardless of theory, to carry her burden Warren "must rebut each nondiscriminatory or nonretaliatory reason articulated by [Fannie Mae]." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007); *see also Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015) ("An employee seeking to show pretext must rebut each discrete reason proffered by the employer."). Fannie Mae's reason here has been laid out in detail: Warren, in Fannie Mae's estimation, had an improper working relationship with Finch and purportedly concealed that relationship, as well as Finch's consulting-type relationship with Djiya, from Fannie Mae's management.

---

[7] With respect to the mixed motive theory, Warren has failed to demonstrate that Fannie Mae's reasons for terminating her was based on both legitimate and unlawful purposes. And Fannie Mae has not indicated in any of its filings that its reasons for terminating Warren were based on a mixed motive theory.

Warren makes ten arguments for why Fannie Mae's rationale was mere pretext: (1) Fannie Mae deviated from its progressive discipline procedures; (2) Fannie Mae inadequately trained Warren; (3) Warren kept her supervisor informed about Finch and Djiya; (4) Fannie Mae selectively enforced its policies; (5) Fannie Mae's management team approved of Spinetto's activities; (6) fact issues exist over the AMN access policy; (7) Finch actively promoted his services without objection from Fannie Mae's management; (8) Fannie Mae's management selected Spinetto to appear in one of Fannie Mae's commercials in Maryland; (9) Fannie Mae's investigations unit conducted partial, biased investigations; and (10) Fannie Mae's investigations unit consulted with members of Fannie Mae's management team that knew Warren's race while the investigation was ongoing. Doc. 65, Pl.'s Resp. 14–23. As for mixed motive, Warren further asserts that Fannie Mae unequally enforced its Code of Conduct in a discriminatory manner. *Id.* at 23–26.

Yet despite those contentions, Warren fails to rebut Fannie Mae's proffered nondiscriminatory rationale by offering evidence sufficient for a reasonable jury to find that race played some role in her termination. *See King*, 2011 WL 1562964, at *5–6. The Court addresses each of Warren's arguments in turn.

i. *Fannie Mae deviated from its progressive discipline policy*

Warren claims that Fannie Mae deviated from its progressive discipline policy when it fired her because she did not know that her conduct was improper and had no prior disciplinary record. *See* Doc. 65, Pl.'s Resp. 14–15. But Fannie Mae notes in its Reply, the document Warren points to as evidence of Fannie Mae's "progressive discipline policy" is not a progressive discipline policy at all. *See* Doc. 69, Def.'s Reply 5 (citing Doc. 66, Pl.'s App. 574, Ex. 12, Investigations Procedure). Rather, it is an appendix to Fannie Mae's Investigations Procedure titled "Factors Considered by

Investigations When Determining Directed Actions," and it states, in pertinent part, as follows:

> The Managing Director (or his/her designee) may consider the following criteria when determining Directed Actions. *The actual Directed Action is dependent on the specific facts and circumstances of the violation, and thus these criteria are instructive, but not determinative.* Directed Actions, in ascending order of severity, include counseling, issuance of a Memorandum of Concern, issuance of a Formal Reprimand, suspension, and termination.

Doc. 66, Pl.'s App. 574, Ex. 12, Investigations Procedure (emphasis added). In other words, the summary judgment record makes plain that the "progressive discipline policy" that Warren bases her argument on is actually just a set of permissive guidelines for Fannie Mae's investigators to consider in context with "the specific facts and circumstances of the violation." *Id.*

As set forth above, Fannie Mae's evidence shows that its investigator Arrington determined that under these circumstances, employees would be placed into one of three disciplinary categories: (1) those that didn't violate the Code of Conduct; (2) those that violated the Code of Conduct but didn't conceal it; and (3) those that violated the code of conduct and concealed it. Doc. 55, Def.'s App. 224–25, Ex. 19, Arrington Decl. Employees in the first category were not disciplined, those in second were disciplined but not fired, and those in the third were fired. *See id.*

Fannie Mae's investigation concluded that Warren fell into the third category. *Id.* at 233–36, Ex. 19, Arrington Decl. Ex. B, Pl.'s Investigations Decision; 237–38, Ex. 19, Arrington Decl. Ex. C, Request for Approval of Pl.'s Investigations Decision. And so, the record indicates, Fannie Mae fired her. *See id.* at 225–26, Arrington Decl. Warren offers no evidence beyond the purported "progressive discipline policy" to contradict that chain of events or otherwise satisfy her burden to rebut Fannie Mae's proffered nondiscriminatory reason for her termination. For that reason, Warren's first argument fails.

Warren says that she was inadequately trained "about when assistance by a broker such as Finch to a local broker such as Emma Djiya needed to be brought to the attention of a manager." Doc. 65, Pl.'s Resp. 16 (citing Doc. 66, Pl.'s App. 64, Ex. 3, Peters Depo.). To support that claim, Warren points to her supervisor's deposition testimony, in which her supervisor states that she cannot recall what training was offered on "what does and what doesn't need to be brought to the manager's attention." Doc. 66, Pl.'s App. 64, Ex. 3, Peters Depo. Thus, Warren continues, she was fired for doing exactly what she was trained to do. Doc. 65, Pl.'s Resp. 17. And that, she concludes, constitutes discrimination. *Id.*

Warren is right that in some instances inadequate training "could reasonably support a finding of pretext." *Jinks v. Adv. Protection Sys., Inc.*, 162 F. Supp. 2d 542, 548 n.5 (N.D. Tex. 2001). Yet she is misguided in believing that this is one of those instances because "[i]n the absence of disparate treatment, evidence of inadequate training does not by itself raise an inference of pretext." *Sydney v. ConMed Elec. Surgery*, 275 F. App'x 748, 755 (10th Cir. 2008); *see also id.*

Warren fails to provide sufficient credible evidence to demonstrate that she was trained or otherwise treated differently than any other Fannie Mae employee. Indeed, the crux of her argument seems to be that Fannie Mae's training was poor all around. *See* Doc. 65, Pl.'s Resp. 16 ("Stephanie Small also claimed that she didn't recall any training on what kinds of consulting arrangements were allowed under the Master Listing Agreement."). Warren's position boils down to the claim that it was improper for Fannie Mae to fire her for doing what she thought was right, or at least what was in line with her training. Perhaps. But Warren needed to show more to meet her burden on this point.

Fannie Mae's decision to fire Warren may have been unreasonable, unfair, or even wrong. Yet Fannie Mae "is entitled to be unreasonable so long as it does not act with discriminatory animus." *Sandstad*, 309 F.3d at 899. And here, Warren offers insufficient credible evidence for a reasonable jury to conclude that she was disparately treated or otherwise the victim of discriminatory animus. On that basis, the Court rejects her second argument. *See King*, 2011 WL 1562964, at *5–6.

    *iii.*     *Warren reported her actions to management*

Warren argues that she disclosed her relationship with Finch to her supervisor. Doc. 65, Pl.'s Resp. 17. Thus, she concludes, Fannie Mae's claim that firing her was justified because she concealed that relationship is unfounded. *Id.*

The Court has already clarified that the summary judgment record reflects that Warren did not report Finch and Djiya's activities to her supervisor. *See supra* p. 15–19. Warren, to be sure, contests that conclusion and claims in her declaration that she "may" have reported to her supervisor, and definitely intended to. *See* Doc. 72, Pl.'s Obj. Resp. 4–6; Doc. 66, Pl.'s App. 7, Warren Decl. ¶ 22. Yet the overwhelming weight of evidence—both Fannie Mae's records and Warren's prior statements—suggests just the opposite. *See* Doc. 67, Def.'s Obj. 4 (citing Doc. 55, Def.'s App. 99:2–10, 101:11–14, 112:18–113:4, 141:13–142:2, Ex. 5, Warren Depo.; Doc. 66, Pl.'s App. 7, Warren Decl. ¶ 22; Doc. 68, Def.'s App. Supp. Def.'s Obj.).

As set forth above, Warren cannot defeat Fannie Mae's Motion for Summary Judgment by introducing "'an affidavit that impeaches, without explanation, sworn testimony.'" *Hudson*, 539 F. App'x at 620 (5th Cir. 2013) (quoting *S.W.S. Erectors*, 72 F.3d at 495). And that is exactly what Warrens does here. Accordingly, her third argument falls flat. *See id.*

iv.     *Fannie Mae selectively enforced its policies*

Warren next argues that Fannie Mae selectively enforced its internal policies by firing her for violating a rarely enforced policy but declining to fire other employees who committed similar infractions. Doc. 65, Pl.'s Resp. 18. In essence, Warren alleges that Fannie Mae treated her differently from other employees who were investigated for their ties to Finch and Spinetto because of her race. Yet as Fannie Mae sets forth exhaustively in the investigation reports included with its Appendix, that just was not the case. *See* Doc. 56, Def.'s Sealed App. 385–590, Exs. 33–53, Investigation Files & Disciplinary Decisions. Fannie Mae's briefing more or less captures the distribution of how it treated its employees and enforced its policies with the following table:[8]

| Name | Action Taken | Disposition of Allegation | Race |
|------|-------------|--------------------------|------|
| Linda Brooks | None | Not Viable | Black or African American |
| Brad Eubanks | None | Not Viable | White |
| Marsha Peters | None | Not Viable | White |
| Samir Bibi | None | Unsubstantiated | White |
| Terrell Jones | None | Unsubstantiated | Black or African American |
| Delina Mwakuriga | None | Unsubstantiated | Black or African American |
| Gina Justman | Memo of Concern | Substantiated | White |
| Shirley Small | Formal Reprimand | Substantiated | White |
| Brian Kapprel | Formal Reprimand and Two-Week Unpaid Suspension | Substantiated | White |
| Stephanie Neugent | Termination | Substantiated | White |
| Melvin Romero | Termination | Substantiated | Hispanic or Latino |

---

[8]The table is drawn from Doc. 54, Def.'s Br. 24. Footnote 16 on that page cites to each employee's investigation record in Fannie Mae's appendix.

| Lynette Sandige | Termination | Substantiated | White |
| Stephanie Warren | Termination | Substantiated | Black or African American |

And that treatment is consistent with the three employee classifications described by Fannie Mae's investigator Arrington in Fannie Mae's summary judgment evidence. *See* Doc. 55, Def.'s App. 224–25, Ex. 19, Arrington Decl. Warren nevertheless points to specific employees as examples of inequitable treatment. *See, e.g.*, Doc. 65, Pl.'s Resp. 19. Brian Kapprel, a young white male, dealt with Spinetto for more than a year, Warren claims, but he was not fired. *Id.* And Shirley Small, "an older white woman," "engaged in essentially identical conduct" yet was only reprimanded. *Id.*

But each of the instances that Warren relies on—and there are more than two—involves facts and circumstances different from her own that could warrant different treatment under Fannie Mae's Investigations Policy. *See* Doc. 66, Pl.'s App. 574, Ex. 12, Investigations Procedure. For instance, Fannie Mae's investigations into both Kapprel and Small concluded that neither affirmatively concealed information from Fannie Mae. *See* Doc. 56, Def.'s Sealed App. 445–46, 488. Warren's own brief concedes as much. *See* Doc. 65, Pl.'s Resp. 19 (explaining that Fannie Mae "only justified [the] severity [of Warren's termination] due to the alleged concealment, which in fact didn't happen"). And as set forth in Fannie Mae's summary judgment evidence, that is a key distinction—employees that violated the Code of Conduct were punished but those that concealed their violations were fired. *See* Doc. 55, Def.'s App. 224–25, Ex. 19, Arrington Decl. In other words, Warren's examples demonstrate uniform rather than selective policy enforcement by Fannie Mae.

The same goes for Warren's other examples: Different sets of facts and circumstances were involved. *See, e.g.*, Doc. 69, Def.'s Reply 12–14. So despite her assertions of inequity and bias, Warren fails to offer sufficient credible evidence to show that Fannie Mae applied its policies

selectively or to otherwise rebut Fannie Mae's proffered nondiscriminatory rationale for its decision to fire her. The Court therefore rejects Warren's fourth argument.

> ### v. *Fannie Mae approved of Spinetto's actions*

Warren next claims that Fannie Mae's management approved schemes like the one at issue here. Doc. 65, Pl.'s Resp. 20. In particular, Warren says that a Vice President at Fannie Mae, white male David Box, approved of Spinetto's "consulting services plan from its inception." Doc. 65, Pl.'s Resp. 20 (citing Doc. 66, Pl.'s App. 532, Ex. 11, Spinetto Decl.). What's more, Warren continues, one of Fannie Mae's Directors, another white man named Peter Poidomoni, worked with Spinetto to bring on new brokers in the Chicago area while he was based out of Virginia. *Id.* (citing Doc. 66, Pl.'s App. 383–84, Ex. 7, Spinetto Depo.). Those actions were materially the same as Warren's, yet Fannie Mae neither investigated nor punished Box or Poidomoni. *Id.* Thus, Warren concludes, Fannie Mae's actions towards her were discriminatory. *Id.*

Fannie Mae replies that its treatment of Box and Poidomoni was warranted for two reasons. Doc. 69, Def.'s Reply 12–14. First, they held different positions. Warren was a sales rep. Box, by contrast, is a Vice President. *Id.* at 13 (citing Doc. 66, Pl.'s App. 116, Ex. 4, Kocks Depo.). And Poidomoni is a Director. *Id.* at 12 (citing Doc. 66, Pl.'s App. 382, Ex. 8, Spinetto Depo.). Each of those jobs entails different job responsibilities and holds a different place in Fannie Mae's corporate hierarchy. *Id.* at 13. Second, they engaged in different conduct. *Id.* at 12–13. Box invited Spinetto to appear in a commercial, but he did not conceal his relationship with Box or give him an inappropriate advantage. *Id.* at 13. Poidomoni worked with Spinetto[9] in a similarly transparent

---

[9]Fannie Mae also contests the evidence on which Warren rests her claims about Poidomoni's activities. As explained above, the Court cannot weigh credibility at this stage. But that does not matter here. Even assuming Poidomoni did what Warren alleged, the positions and behavior are sufficiently different to

fashion, Fannie Mae says. In short, Fannie Mae concludes, this is not the same conduct that Warren engaged in so her situation cannot be compared to theirs. *Id.*

The Court agrees with Fannie Mae: Different sets of facts and circumstances were involved here, thus different responses were reasonable. Warren again seems to challenge the fairness of Fannie Mae's decision—her behavior, she believes, wasn't severe enough to justify firing her. But as previously established, Fannie Mae is entitled to make irrational or unfair decisions so long as they are not discriminatory. *Sandstad*, 309 F.3d at 899. And Warren has yet to point to another employee who was similarly situated—with regard to both position and conduct—that was treated differently, not to mention on the basis of some protected class. *See Nelson v. Lowe's Home Ctrs., Inc.*, No. 3:11-cv-1497-B, 2012 WL 3731092, at *3 (N.D. Tex. Aug. 29, 2012) (explaining that an employee is similarly situated when both employees are similarly positioned in company hierarchy and participate in nearly identical conduct). Thus, Warren's fifth argument fails.

   *vi.*   *Fact issues exist on AMN access policy*

Warren argues that there is a question of fact over what the commonly followed policy on AMN access by REO brokers and their assistants was at the time she was fired. Doc. 65, Pl.'s Resp. 21. Here, too, Warren misses the mark. Even assuming that she is right on this point, that line of reasoning circles back to what looks to be the thrust of her case: She didn't deserve to be fired. Again, however, the Court's charge is not to second-guess Fannie Mae's personnel decisions; rather it is to determine whether Warren was discriminated against on account of her race. *Sandstad*, 309 F.3d at 899. And the overwhelming weight of summary judgement evidence indicates that she was

---

warrant Fannie Mae's differing responses.

not.

Warren continually attacks Fannie Mae's decision as a poor one, yet she needs to provide sufficient credible evidence to support a jury finding that it was a discriminatory one. As encapsulated by the table above, she has not. *See King*, 2011 WL 1562964, at *5–6. For that reason, the Court rejects her sixth argument.

*vii.*      *Finch promoted his work with Fannie Mae's blessing*

Warren next asserts that rather than concealing his actions, Finch actively promoted them with Fannie Mae's management. Doc. 65, Pl.'s Resp. 21 (citing Doc. 66, Pl.'s App. 165, Ex. 5, Finch Depo.). Warren claims that Finch spoke to Warren's supervisor about assisting other brokers and that "she apparently had no problem with it." *Id.* at 22 (citing Doc. 66, Pl.'s App. 167, Ex. 5, Finch Depo.). But as Fannie Mae notes in its Reply, the evidence Warren points to in support of that claim, Finch's deposition, does not much support it. Doc. 69, Def.'s Reply 10–11. Finch states that he met with Warren's supervisor in April 2011 and explained that some emails sent to other brokers would also be sent to him. The testimony continues in pertinent part:

> Q.    What did you tell Ms. Peters [Warren's supervisor] about the kinds of assistance that you were providing to the rural Fannie Mae workers?
>
> A.    I – man, I – I don't – I don't remember. I'm trying to think of if any of that was talked about. I don't know how much of the rural things – I guess I kind of left that type of discussion to be with the rep. I – mine was more of a – I mean, literally, she wrote down what the broker's name, you know, and where is the name of the company. So it was like Gary Duda, Re/Max Action; you know, Jerry Richards, Re/Max Capital; Danny Gettier, Re/Max One. Well, maybe it was Re/Max First. So, anyway, she knew that way. It was really just a five-minute conversation. It was an improv meeting because she just happened to be there.

Doc. 66, Pl.'s App. 167, Ex. 5, Finch Depo. So while Finch might have mentioned his emails to

Warren's supervisor, there does not seem to be any indication that she knew about his assistance to REO Brokers, let alone approved of it. Warren's supervisor's own testimony, cited to by Fannie Mae, supports that conclusion. Doc. 56, Def.'s App. 315–16, Ex. 25, Peters Depo.

But more to the point, none of that goes towards Warren's burden of proving discriminatory animus. Fannie Mae, as its summary judgment evidence shows, fired similarly situated employees of different races and genders because they concealed their involvement with Finch or Spinetto. If the Court were to accept Warren's claim on this point—which it does not—then it would go towards the proposition that none of the employees that were fired should have been. In other words, Warren again attacks the prudence of Fannie Mae's decision rather than satisfying her burden to show that it was discriminatory. And thus her seventh argument fails. *See King*, 2011 WL 1562964, at *5–6.

      *viii.*      *Spinetto appeared in a commercial for Fannie Mae*

For her eighth argument, Warren points out that Box, Fannie Mae's white Vice President, selected Spinetto to appear in a commercial. Doc. 65, Pl.'s Resp. 22 (citing Doc. 66, Pl.'s App. 377–78, Ex. 8, Spinetto Depo.). That, she says, is tantamount to an endorsement and surely gave Spinetto some improper advantage, yet Box was never investigated. *Id.* As explained above, however, Box's actions involved different facts and circumstances than did Warren's. So her eight argument fails for the same reason as her fifth. *See Sandstad*, 309 F.3d at 899.

      *ix.*      *Fannie Mae's investigations unit conducted partial, biased investigations*

Warren next argues that Fannie Mae's investigators, Chadsey and Arrington, were partial and deliberately ignored evidence to justify their results. Doc. 65, Pl.'s Resp. 22. Warren asserts that here, Chadsey and Arrington ignored evidence that Warren told her supervisor about Finch and points to Keitha Jefferson's testimony to support her claim that Chadsey and Arrington "have poor

reputations for truthfulness."

The Court has already stricken Warren's declaration to the extent that it stands to say that she told her supervisor about Finch because it was a sham—the overwhelming weight of summary judgment evidence, both Fannie Mae's records and Warren's own prior statements, suggest that just the opposite is true. *See supra* p. 15–19. The Court has also stricken Jefferson's declaration as irrelevant. *See supra* p. 14–15.

Beyond those two pieces of evidence, Warren's only offer in support of her claim that Chadsey and Arrington were partial is her conclusory allegation that another former employee allegedly found a different investigator to be biased and a restatement of her earlier argument about Fannie Mae's purportedly disparate treatment of Kapprel, Poidomoni, and Box. Doc. 65, Pl.'s Resp. 22. The Court has already addressed why Fannie Mae's treatment of Kapprel, Poidomoni, and Box does support a finding of pretext. And the standalone allegation of bias against an unrelated investigator does little to persuade the Court that Warren was the victim of discrimination. To meet her burden here, Warren needed to demonstrate credible evidence sufficient for a reasonable jury to find pretext. She did not. And so the Court rejects her ninth argument. *See King*, 2011 WL 1562964, at *5–6.

> x. *Fannie Mae's investigations unit consulted with Fannie Mae's management team that was aware of Warren's race during the investigation*

For her tenth argument, Warren claims that Chadsey and Arrington conferred about her investigation and potential punishment with Fannie Mae's management, "who presumably knew the race of various employees, and identified them for investigation." Doc. 65, Pl.'s Resp. 23 (citing Doc. 66, Pl.'s App. 575, Ex. 13, Investigator's Notes). Thus, Warren concludes, "Chadsey and presumably

Arrington knew that Warren was African American shortly *after* the termination." *Id.* (emphasis added).

For starters, Warren's brief asserts that Fannie Mae's investigators learned about her race *after* she was fired, if at all. So it is somewhat unclear, temporally speaking, how they could have used that knowledge to discriminate against her during the investigation. Overlooking that issue, the Court finds Warren's evidentiary offering—a single page of handwritten notes about a conversation with management that does not mention race at all—unpersuasive. Fannie Mae admits that its investigator's confer with management to ensure that they have gathered all pertinent facts. *See* Doc. 54, Def.'s Br. 5–6. But management does not, Fannie Mae claims, play a role in the decision making process for directed action. *Id.* Warren fails to offer any evidence to the contrary. For those reasons, Warren's tenth argument fails.

xi.     *Fannie Mae's purported disparate treatment of its employees demonstrates race was a motivating factor in its decision making process*

Finally, Warren argues that Fannie Mae treated its employees differently based on their race. Doc. 65, Pl.'s Resp. 23–26. That, she says, is evidence of an unlawful motivating factor. *Id.* To support that claim, Warren summarizes the all of the examples she pointed to as evidence of pretext.

As referenced, to show mixed motive Warren must "present sufficient evidence for a reasonable jury to conclude that race . . . was a motivating factor for the employment practice at issue." *King*, 2011 WL 1562964, at *5. And as the Court has made plain a number of times now, she has not. The overwhelming weight of evidence in the summary judgment record indicates that Fannie Mae treated its employees equitably, regardless of race. The table provided by Fannie Mae, and included above, both summarizes and illustrates Fannie Mae's evidentiary offering. Warren, for

her part, has failed to meet her burden to rebut that evidence.

At bottom, it seems Warren believes that Fannie Mae fired her for a bogus reason. Maybe. Yet "[e]mployment discrimination laws are 'not intended to be a vehicle for judicial second-guessing of business decisions, nor to transform courts into personnel managers.'" *Bryant v. Compass Grp. USA Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) (quoting *Bienkowski v. Am. Airlines, Inc.*, 851 F.2d 1503, 1507–08 (5th Cir. 1988)). With that in mind, "[m]anagement does not have to make the proper decisions, only non-discriminatory ones." *Id.*

Fannie Mae offered ample evidence to support its nondiscriminatory reason for firing Warren. Warren failed to provide sufficient proof to rebut Fannie Mae's proffered rationale. For that reason, the Court **GRANTS** Fannie Mae's Motion for Summary Judgment on Warren's claims for race discrimination under Title VII, Section 1981, and the TCHRA. *See McCoy*, 492 F.3d at 557.

## IV.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Fannie Mae's Motion for Summary Judgment in its entirety. And so the Court **DISMISSES with prejudice** Warren's suit. Final Judgment will follow this Order.

**SO ORDERED.**

**SIGNED: April 14, 2017**.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE